IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MAUREEN COWAN,                  }
                                }
        Plaintiff,              }
                                }        CIVIL ACTION NO.
v.                              }        09-AR-1489-S
                                }
SEPRACOR, INC.,                 }
                                }
        Defendant.              }

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion for summary judgment (Doc. 45)[1] filed by defendant, Sepracor, Inc. ("Sepracor"), challenging all claims brought by plaintiff, Maureen Cowan ("Cowan"). Cowan, a black female, makes the following claims against Sepracor, her former employer: (1) racially and gender-based discriminatory termination under Title VII of the Civil Rights act of 1964 ("Title VII") and 42 U.S.C § 1981 ("§ 1981"); and (2) retaliation under Title VII, § 1981, and the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. Also pending are Sepracor's motion to strike (Doc. 54) the declaration of L. William Smith and Exhibit A (Doc. 58-1), and Cowan's motion to strike (Doc. 52) the declaration of Jeff Albright (Doc. 47-49 at ¶9.) Both motions to strike will be denied. Sepracor's motion for summary judgment will be granted in part and denied in part. All facts are viewed in the light most favorable to Cowan.

---

[1] All references to (Doc. __ at __) refer to the document and page numbers assigned by the court's electronic filing system.

**FACTS**

Sepracor[2] is a pharmaceutical company that focuses on central nervous system and respiratory therapies. (Doc. 47-49 at ¶2.)  In 2008, Sepracor had hundreds of sales representatives operating nationally.  (*Id.*)  These sales representatives were organized according to the region in which they operated, the products they sold, and the type of customers they serviced.  (*Id.*)  Sepracor's representatives who concentrated upon institutional clients, such as hospitals and specific medical practices, were referred to as Institutional Sales Specialists ("ISSs"), and were considered the elite of Sepracor's sales force.  (*Id.* at ¶ 3)  ISSs typically had extensive experience and had proven success as sales representatives in the pharmaceutical industry before being made ISSs.  (*Id.*)

None of Sepracor's ISSs regularly reported to a traditional office.  (*Id.* at ¶4)  Instead, ISSs worked remotely out of their homes and cars, and their supervisors managed them via telephone, e-mail, and periodic meetings.  (*Id.*) ISSs were expected to manage their calendars without extensive supervision.  (*Id.*)  ISSs were expected, on their own initiative, to schedule and make sales visits ("calls") with institutional clients located in their territories.

---

[2]  As a result of a 2009 acquisition and a 2010 merger, Sepracor changed its name to "Sunovion Pharmaceuticals, Inc." in October 2010.  (Doc. 46 at 3 n.1.)  "Sepracor" is used in this opinion because that was the name of the company during the relevant time period.

(*Id.*)  In addition to selling Sepracor products to institutional clients, ISSs were expected to be Sepracor's primary contact with clients, and were expected to address clients' questions and concerns, as well to provide them with the latest information about Sepracor products.  (*Id.* at ¶5.)  Because ISSs did not report to an office or supervisors on a daily basis, they were directed to note their call activity and any pertinent call details on STARS, a remotely accessible call reporting software system.  (Doc. 47-1 at 17.)

Cowan, a black female, already had nearly three (3) years of pharmaceutical sales experience when she was hired as an ISS by Sepracor in April of 2004.  (Doc. 47-1 at 22-23, 39.)  Cowan's territory encompassed most of north Alabama, including the cities of Birmingham, Huntsville, Anniston, Gadsden, Cullman, Decatur, and, except for a four month period from January to April of 2008, Tuscaloosa.  (*Id.* at 14-15; Doc. 47-8 at 46.)  Cowan sold two Sepracor products: Brovana and Xoponex.  (Doc. 47-49 at ¶7.)  Brovana, a nebulizer treatment for patients suffering from COPD, was the primary Sepracor product. (*Id.*)  Xoponex, a fast acting medicine that treats narrowed airways associated with COPD and athsma, constituted about one-fifth of Cowan's product mix (Doc. 47-49 at ¶7).  As an ISS, Cowan was expected to make calls on hospitals and practices, including physicians themselves and other medical personnel, within her territory.  (Doc. 47-49 at ¶4; Doc. 47-2 at

3

7.)  For the first few years that Cowan worked as an ISS, she advanced.  (Doc. 47-1 at 16.)  In 2005, Cowan was chosen to participate in Sepracor's Regional Council.  (Doc. 47-38 at 16.) This was an indication that she was performing well, or at least satisfactorily.  (*Id.*)  From 2004 through 2006, Cowan's performance reviews reflect that she either achieved or exceeded expectations in every measured category.  (Doc. 47-23 at 40.)  In 2007, however, Cowan's performance review reflects that while she achieved expectations in every other category, she did not achieve them for administrative tasks.  (*Id.* at 39.)

On January 29, 2007, Cowan filed an internal complaint with Sepracor's Human Resources Department ("H.R."), claiming that her then supervisor, Tyrone Dunn ("Dunn"), sexually harassed her by propositioning her at a hotel.  (Doc. 47-1 at 12; Doc. 46 at 10.) On May 14, 2007, Cowan filed a Charge of Discrimination with the EEOC, making the same allegations.  (Doc. 47-1 at 13; Doc. 47-36 at 33-34; Doc. 46 at 10.)   Cowan, claiming stress caused by these events, took FMLA leave from August 8 through October 2, 2007. (Doc. 46 at 10; Doc. 53 at 7.)  Sepracor fired Dunn, engaged in the EEOC's mediation process with Cowan, and settled her claim on December 21, 2007, for $1,500 and bonus eligibility.  (Doc. 47-23 at 44.)

After firing Dunn, Sepracor reorganized, and Jeff Albright ("Albright") was hired as the Regional Director ("Director") for the Birmingham Territory in January of 2008, becoming Cowan's

4

supervisor.  (Doc. 47-1 at 15; Doc. 47-10 at 27; Doc. 47-49 at ¶ 6.)
Soon after Albright became Director, he placed an emphasis on
administrative  duties for the ISSs, including the importance of
daily call reporting on the STARS system, timely expense reports,
reporting time off, and communicating with supervisors.  (Doc. 47-48
at ¶¶ 4-5; Doc. 47-16 at 14-16.)  Albright also stressed the
importance of maintaining an average of 6.5 calls per day and
improving the detail of call notes entered into STARS.  (Doc. 47-48
at ¶ 4.)

On January 22, 2008, Albright contacted Jenny Munroe
("Munroe"), a Sepracor H.R. employee, regarding his concerns about
Cowan's administrative performance, including that she did not enter
calls into STARS on a daily bases and entered excessive amounts of
calls on individual days.  (Doc. 47-26 at 2.)  On February 19, 2008,
Albright went on a field ride with Cowan.  (Doc. 47-49 at ¶ 8.)
During a field ride, a Sepracor manager accompanies a sales
representative making calls to observe and critique their
performance.  (Doc. 47-49 at ¶ 8.)  According to Albright, the ride
did not go well.  Albright opined that Cowan demonstrated poor
selling and group communication skills, and lacked knowledge about
Sepracor's products.  (*Id*.)  During the ride, or shortly thereafter,
Albright learned that Cowan: (1) left product details on a
physician's voice mail, which Albright considered inappropriate; (2)
failed to call on Huntsville Hospital, despite the fact that the

hospital had Brovana on formulary and was potentially a large customer; (3) had not made any calls on DCH in Tuscaloosa, despite Albright's specific direction to do so; (4) failed to distribute any samples; and (5) was not recording calls on STARS on a daily basis. (*Id.* at ¶9.)  All together, Albright considered the field ride to be one of the worst he ever participated in, and concluded "that Cowan was simply not doing her job."  (*Id.* at ¶8.)

Originally, Albright planned to spend half of a day conducting the field ride with Cowan, to be followed by a performance appraisal that afternoon.  However, Albright cancelled the appraisal because Cowan's performance "complicated" the appraisal. (Doc 47-3 at 3-4.) Instead, Cowan and Albright went to a coffee shop where Albright spent two hours critiquing Cowan's performance. (Doc. 47-49 at ¶9.) During the critique, Cowan claims that Albright told her that he knew about her sexual harassment claim against Dunn. (Doc. 37-1 at 30-31.)  Furthermore, Albright told Cowan that he didn't think the claim was justified, but stated "we're going to wipe the slate clean and leave that in the past."  (*Id.*)  Following the ride, Albright prepared a negative Field Assessment Report ("FAR") of Cowan on February 22, 2008.  The FAR measured six categories of performance. Albright rated Cowan as partially meeting expectations in three categories, while failing to meet expectations in three categories. (Doc. 47-16 at 29.)  Munroe, believing that such a negative FAR would damage Albright and Cowan's working relationship, tried to

persuade Albright to soften the FAR and to use it as a teaching tool for Cowan.  (Doc. 47-24 at 1.)  Munroe also pointed out that, given the limited amount of time he spent with Cowan, Albright should not make such broad conclusions about Cowan's product knowledge.  (*Id.*)  Instead of following Munroe's advice, Albright never gave the FAR to Cowan or discussed its contents with her, despite Cowan's repeated requests.  (Doc. 53 at 11.)

After the ride, Albright continued to complain about Cowan's performance.  On February 27, 2008, Albright e-mailed Cowan regarding problems with an expense report that she submitted on February 16, 2008, including that Cowan: (1) bought two airline tickets for one trip; (2) submitted excessive cell phone bills; (3) provided no  supporting information for a promotion event; and (4) submitted the  expense report late.  (Doc. 47-8 at 49.)  On March 7, 2008, Albright learned that Cowan was still not calling on accounts located in Tuscaloosa, and he again e-mailed her.  (Doc. 47-19 at 11-12.)  On March 13, 2008, Albright learned that Cowan missed a lunch scheduled with the Pulmonology Group at Princeton in Birmingham the day before.  (Doc. 47-19 at ¶ 12.)

Cowan provided excuses for each of Albright's complaints.  As to the expense report, Cowan e-mailed that she did not realize that the reporting rules and procedures had changed.  (Doc. 47-8 at 51.)  As for the Tuscaloosa accounts, Cowan stated that, for the first quarter of 2008, Tuscaloosa was outside her territory .  (Doc. 47-19

at 11-12).  As for the missed lunch at Princeton, Cowan claimed that the event was a misunderstanding and that she did not have the event noted on her calendar.  (Doc. 47-8 at 53.)

On March 21, 2008, Albright scheduled a meeting with Cowan at the Birmingham Airport, where he addressed all of his concerns, including what he perceived to be Cowan's lack of teamwork with other sales representatives, and Cowan's low sales numbers.  (Doc. 47-49 at ¶ 13.)  Following this meeting, on March 25, 2008, Cowan sent Albright an e-mail summarizing their conversation, and offering explanations or excuses.  (Doc. 47-8 at 55-59.)  On March 26, 2008, Albright forwarded Cowan's e-mail to Munroe, disputing Cowan's recollection of the meeting.  (Doc. 47-35 at 32-37.)  Albright went on to say:

> **given the history with Maureen** . . . I am becoming increasingly uncomfortable with the situation. . . .  I have been exceptionally clear (since before the process of trying to figure out what Maureen is and is not doing as a sales rep started) that **I am not willing to jeopardize my career** in order to ensure that Maureen is doing her job as the Company sets forth.

(*Id.* at 32) (emphasis added).

Later on March 25, 2008, Cowan sent an e-mail to Munroe, alleging that Albright's excessive scrutiny was in retaliation for Cowan's sexual harassment complaint against Dunn.  (Doc. 47-8 at 62-63.)  On April 9, 2008, Sepracor received a letter from Cowan's then

8

lawyer, making the same retaliation allegations against Albright, and also suggesting that Sepracor was discriminating against Cowan on the basis of her race. (Doc. 47-9 at 39-40.)  On April 18, 2008, after investigating Cowan's allegations, Munroe determined that Albright's scrutiny was not retaliatory, and instead discharged his "responsibility to address and document [Cowan's] performance issues." (*Id.* at 38.)  Although Sepracor's policies dictated that internal complaints and grievances were confidential, Munroe informed Albright of Cowan's retaliation complaint, and, after investigation, told Albright that Cowan's complaint was "baseless" and "not to worry about it."  (Doc. 47-13 at 52.)

In late April, after Cowan had internally complained of retaliation, Albright  created a document entitled "Issue in Birmingham," which listed Cowan's performance problems. (Doc. 47-16 at 4.)  One sub-point on this list was: "Claim against [Regional Director]-found baseless". (*Id.*)  At the end of the document, Cowan included the heading "moving forward," which included the following bullet points:

- Full investigation of call activity
- Full investigation of all expenses
- Dual RD Field Days
- Adjustment to Sales Goals
  - Remove her sales quotas
  - **Remove her**

(*Id.*) (emphasis added).

9

The other issue that came up during this time frame was Cowan's Brovana sales performance during 2008.  In the first quarter of 2008, Albright reviewed reports showing that Cowan only achieved 67% of her sales goals, despite the fact that her sales quota was among the lowest in the nation.  (Doc. 47-49 at ¶ 15; Doc. 47-18.)   This placed Cowan in the bottom 40% of all ISSs nationwide.  (Doc. 47-49 at ¶ 15; Doc. 47-18.)  According to the documents viewed by Albright, during the second quarter of 2008, Cowan only met 15% of her Brovana sales quota, and sold only  one 30-unit box of Brovana in April, 2008.  (Doc. 47-49 at ¶ 15; Doc. 47-18.)  Cowan's Brovana sales were low in both the institutional and home health care markets.  (Doc. 47-49 at ¶ 16.)  Cowan claimed that some of her Brovana sales numbers were misleading because the sales reports generated by a third party wholesaler incorrectly reflected that she sold 30-unit boxes when she sold 60-unit boxes. (Doc. 47-4 at 16-18.)  Likewise, Cowan points to her strong sales of Xoponex, including during June of 2008, when she was ranked in the top 10% of sales representatives nationally for growth in Xoponex Sales.  (DOC. 47-34 at 44-45.)

On May 13, 2008, Albright summoned Cowan to a meeting in his Alpharetta, Georgia office to discuss the numerous performance issues.  (Doc. 47-8 at 60.)  At Albright's insistence, for the protection of his "career . . . given [Cowan's] history," Munroe participated in this meeting via telephone, despite her concerns

10

that Cowan would interpret her presence as treating her differently. (Doc. 47-16 at 24; Doc 47-23 at 32.)  Regarding sales performance, Albright discussed Cowan's: (1) failure to meet Brovana sales quotas for the first quarter of 2008; (2) poor Brovana sales through the home health care market; and (3) lack of call activity for important accounts, especially Huntsville Hospital and DCH Tuscaloosa.  Regarding problems with administrative tasks, Albright pointed out Cowan's: (1) failure to record any calls, or recording few calls on multiple days; (2) recording calls as "other" without further description; (3) failure to record calls promptly; (4) failure to distribute samples; and (5) improper submission of expense reports.  (Doc. 47-49 at ¶ 18.) At the end of the meeting, Albright and Munroe instructed Cowan to provide details within 48 hours regarding her activity during days on which she made few or no calls, as well as for days on which her only description of calls was "other."  (Doc. 47-16 at 60-71.)

Two days later, on May 15, 2008, Cowan sent an e-mail summarizing Albright's criticisms from the May 13 meeting and providing explanations and excuses for those criticisms.  (Doc. 47-9 at 41-46.)  The e-mail did not provide the information regarding Cowan's low and no-call days, as ordered by Albright and Munroe. (*Id.*)  Cowan simply stated that she was unable to provide the information regarding calls described as "other," but would include the information in future call notes.  (*Id.* at 45.)

In response to Cowan's failure to provide information about her call activity, Munroe drafted a fourteen (14) page H.R. intake sheet (Doc. 47-34 at 50-63) on March 17, 2008, which was presented to a senior management committee that made disciplinary decisions (Doc. 47-23 at 23).  Much of the intake sheet consisted of the text of Albright's emails to Cowan, along with some of Cowan's responses to his inquiries. The intake sheet detailed Cowan's performance problems outlined *supra,* but also included information regarding Cowan's sexual harassment complaint against Dunn and her claim of retaliation against Albright.  (Doc. 47-34 at 50-63.)  Likewise, the intake sheet contained reference to Cowan's 2007 FMLA leave. The intake sheet culminated with H.R.'s recommendation that Cowan be terminated.  (*Id.* at 63.)  The management committee instead chose to place Cowan on a Final Warning Performance Improvement Plan ("PIP"), giving her a final chance to explain the call activity and reporting issues.  (Doc. 47-36 at 41.)  A PIP is the final step before termination, and a typical PIP lasts for anywhere from a month to a month and a half.  (Doc. 47-23 at 25.)  Cowan's PIP, issued on June 3, 2008, demanded that she provide call activity information within three days, or face further discipline, up to and including termination.  (Doc. 47-23 at 25; Doc. 47-16 at 54-56.)  Specifically, the PIP directed Cowan to provide call information for: (1) five no call days; (2) three days on which one call was made; (2) seven days on which two calls were made; and (3)

fifteen days on which calls were entered into STARS under the heading "other." (Doc. 47-16 at 54-56.)

On June 4, 2008, claiming stress, anxiety, and depression, Cowan filed for and took FMLA leave, which lasted through July 3, 2008. (Doc. 47-1 at 10-11.) On June 26, 2008, while on FMLA leave, Cowan filed a charge of discrimination with the EEOC, alleging retaliation for her 2007 sexual harassment complaint, as well as racial and gender discrimination. (Doc. 47-5 at 26-27.) During Cowan's FMLA leave, Albright drafted an e-mail to Munroe in which he summarized Cowan's performance issues. Among the problems listed was that "Maureen filed 'retribution' [sic] case against supervisor which after investigation was determined to be baseless." (Doc. 47-16 at 2.)

Upon returning from FMLA leave on July 3, 2008, Cowan provided a letter attempting a belated response to the PIP's request for call information. (Doc. 47-9 at 51-58.) After reviewing and discussing Cowan's letter, Albright and Munroe concluded that Cowan's responses were inadequate. (Doc. 47-49 at ¶ 21.) They drafted a second H.R. intake sheet recommending Cowan's termination. (*Id.*; Doc. 47-37 at 66-67.) This two (2) page intake sheet provided a shorter summary of Cowan's performance issues, including her problems with call activity, expense reporting, and poor sales. (Doc. 47-37 at 66-67.) The second intake sheet also referenced Cowan's 2007 sexual harassment charge in four separate

bullet points, and referenced Cowan's charge of retaliation against Albright. (*Id.*)  The intake sheet concluded by stating that, based upon Cowan's inadequate responses to the PIP, as well as "the additional performance issues outlined above, HR recommends termination." (*Id.* at 67.)  In deciding to terminate Cowan, the management committee relied upon both the first and second intake sheets. (Doc. 47-36 at 27-31.)  Cowan was notified of her termination via a phone call on July 30, 2008. (Doc. 47-4 at 4.)

Cowan points to numerous non-protected comparators whom she claims had similar, or worse, performance, but were treated more favorably. Regarding call activity, Cowan contends that white ISSs had lower overall call volume. Specifically, Cowan points to Brad Fultz, a white male, Julie Powell, a white female, and Christian Herman, a white male. Each of these ISSs had fewer calls on average than Cowan, but were not placed on a PIP or terminated. (Doc. 47-18; Doc. 47-14 at 47-78; Doc. 53 at 21.)

Cowan also points to Brad Fultz and Jeff Richardson, both white male ISSs, as having more no-call days than Cowan. (Doc. 58-1 at 2.)  Neither Fultz nor Richardson was placed on a PIP for no-call days. Instead, Richardson was placed on a coaching plan, less severe discipline than a PIP. (Doc. 47-10 at 23.)  Fultz, who was one of Sepracor's top sales performers for the first quarter of 2008 and ranked fourth out of all ISSs nationally in total earning percentage, was placed on a month-long PIP for sample

14

accountability problems.  (Doc. 47-13 at 22-23.)  Cowan also argues that her call numbers were low because she received conflicting instructions regarding whether to report attempted calls in STARS. (Doc. 47-4 at 1-2.)

At the time that Cowan was fired, Sepracor was under a hiring freeze, so a replacement was not immediately hired.  (Doc. 47-13 at 57.)  Before the hiring freeze was lifted, Sepracor realigned its sales territories, splitting Cowan's former territory into three territories.  (*Id.*)  When Sepracor finally hired three new ISSs to cover Cowan's former territory, it hired two white males, Josh Beard and Thomas Elmore, as well as one white female, Margie Boshell.  (*Id.*; *id.* at 59.)

**Motions to Strike**

Rule 56 F.R.Civ.P. was amended on December 1, 2010.  When the Federal Rules of Civil Procedure change, the amended rule generally governs pending proceedings from the date of amendment forward, unless "[t]he court in which the action is pending determines that applying the rule would not be feasible or would work an injustice in that action. . . .  In such a case, the former rule applies." 8 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 41.50[7][A](3d ed. 2010).

Sepracor filed its motion for summary judgment on October 29, 2010.  Sepracor's evidentiary submissions in support of its motion

include the declaration of Jeff Albright, which is the subject of Cowan's motion to strike. Cowan responded to Sepracor's motion for summary judgment on November 19, 2010. (Doc. 53.) Cowan's response included the evidentiary material that is the subject of Sepracor's motion to strike. While Sepracor's motion for summary judgment did not come under submission until December 3, 2010, two days after amended Rule 56 took effect, the motion for summary judgment and purportedly objectionable evidence were filed before December 1, 2010. The court finds that under these circumstances, it would be infeasible to apply the new rule, and will apply Rule 56 as it existed prior to December 1, 2010, to the instant motion for summary judgment and the attendant motions to strike.

The prior version of Rule 56(e)(1) states:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that **would be admissible in evidence,** and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Rule 56(e)(1) F.R.Civ.P. (emphasis added). The parties' motions to strike are addressed in turn.

Sepracor moves to strike portions of Cowan's Exhibit A. (Doc. 58-1). Exhibit A consists of: (1) STARS system data detailing the

call activity of Brad Fultz, Cowan's purported comparator; (2) a spreadsheet summarizing Fultz's call data (the "Summary"), created by L. William Smith ("Smith"), one of Cowan's attorneys, ; and (3) Smith's declaration regarding the methods he used to create the Summary.  Both the Summary and Smith's affidavit purport to show that, during 2008, there were eighty three (83) days on which no calls were entered by Fultz, seven (7) days on which only one (1) call was entered, and four (4) days on which only two (2) calls were entered.  (*Id.* at 2.)  Smith's affidavit declares that the figures are "based on [his] calculations," and exclude federal holidays.  (*Id.*)

Sepracor objects to Exhibit A on the grounds that: (1)  it is conclusory and not based on personal knowledge; (2) it is speculative; (3) Smith is not identified as an expert qualified to create or interpret spreadsheets; (4)the exhibit is misleading and unreliable; and (5) the exhibit relies on an unauthenticated document.  (Doc. 54 at 4-9.)

Regarding the Summary, the Federal Rules of Evidence provide that:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place.  The court may order that they be produced in court.

17

Rule 1006, F.R.Evid.  Here, the Summary is based on voluminous records from the STARS system.  Because the records, which would be admissible at trial, *see infra,* were provided to Cowan by Sepracor, Sepracor had the opportunity to inspect them.  *See Morales-Arcadio v. Shannon Produce Farms, Inc.* 2007 WL 2106188 at *13 (S.D. Ga. July 18, 2007) (*superseded by regulation on other grounds as stated in Garcia v. Frog Island Seafood, Inc,* 644 F.Supp. 2d 696 (E.D.N.C. 2009) (citing *Peat, Inc. V. Vanguard Research, Inc.,* 378 F.3d 1154, 1159 (11th Cir. 2004)). Accordingly, the discussion of Sepracor's motion to strike will focus upon Smith's affidavit.

As to Sepracor's argument that Smith is not qualified as an expert capable of interpreting or producing spreadsheets, Rule 702 F.R.Evid. provides that evidence which requires "scientific, technical, or other specialized knowledge" shall be given by an expert witness.  As Cowan rightly argues, counting and cataloging the number of days on which Fultz logged few or no calls does not require expert knowledge.

As to Sepracor's personal knowledge argument, Smith's affidavit declares that the Summary was based entirely upon discovery provided by Sepracor.  "According to the Federal Rules of Evidence, personal knowledge can be established by showing that the witness was in a physical position to see, hear, or otherwise perceive the matters to which the testimony relates."  *Johnson v.*

18

*Scotty's, Inc.,* 119 F.Supp. 2d 1276, 1281 (M.D.Fla. 2000) (citing Rule 602, F.R.Evid.)  Smith, as one of Cowan's attorneys, was in a position to see the discovery produced by Sepracor at Cowan's request.  Smith's declaration states that the figures are "based on [his] calculations."  Smith's sworn statements regarding Fultz's no-call days are not conclusory or speculative because they are supported by the data provided by Sepracor. *See Leigh v. Warner Brothers, Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000).  They could just as well have been cataloged in Cowan's brief by referring to the documents of testimony they came from.

As to Sepracor's authentication argument, "[t]he general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial."  *Longcrier v. HL-A Co., Inc.* 595 F.Supp. 2d 1218, 1223 (S.D. Ala. 2008) (citing *Rowell v. BellSouth Corp.,* 433 F.3d 794, 800 (11th Cir. 2005) for the proposition that "[o]n motions for summary judgment, we may consider only that evidence which **can be reduced to an admissible form**")(emphasis added); *see also U.S. Aviation Underwriters, Inc. V. Yellow Freight Sys., Inc.,* 296 F. Supp. 2d 1322, 1327 n.2 (S.D. Ala. 2008).  The court finds no reason why the underlying STARS records cannot be reduced to admissible form at trial.  Because Sepracor's authentication argument fails, its motion to strike will be denied.

19

Cowan moves, under the sham affidavit theory, to strike one sentence from Albright's affidavit in which he states that she did not meet her sales quota for a single month in 2008.  Cowan argues that Albright's declaration is a sham because it contradicts part of Albright's deposition testimony.  The portion of the deposition testimony at issue was as follows:

> Q:   So if she sold a hundred and thirty units or two hundred units through these – like these accounts that were she says there were discrepancies on, that would mean she wouldn't meet her quota for the whole year, right?
>
> MR. HARRELL: Object to the form.
>
> A:   There is, in fact, a month where she met her quota.
>
> Q:   Which month was that?
>
> A:   March of 2008.

(Doc. 47-14 at 45.)   Numerous Eleventh Circuit decisions hold that:

> When a party has given clear answers to **unambiguous questions** which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.

*Reese v. Herbert,* 527 F.3d 1253, 1270 n.28 (11th Cir. 2008) (emphasis added)(quoting *Van T. Junkins and Assoc., Inc. V. U.S. Indus., Inc.,* 735 F. 2d 656, 657 (11th Cir. 1984)).

In the instant case, the question posed to Albright was

hardly unambiguous, as indicated by the form objection.  It is unclear whether Albright was intending definitively to say that Cowan met her sales quota in March of 2008 or was conjecturing that, under the conditions imposed by the question, Cowan would have met her sales quota for that month.  The sham affidavit theory does not apply.  Cowan's motion to strike will be denied. To the extent an issue of credibility arises from discrepancies in Albright's testimony, the procedural posture demands that the court construe all factual disputes in favor of Cowan.

**Title VII and § 1981 Discrimination Claims**

The elements required to demonstrate Title VII race discrimination and retaliation claims are identical to those required under § 1981. *See Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1277 (11th Cir. 2008); *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 523 n.2 (11th Cir. 1994).  Section 1981 is not available for the gender discrimination claim.  Accordingly, where Cowan's claims may invoke both statutes, reference to the requirements of Title VII claims will implicitly refer to § 1981 claims as well. Title VII precludes employers from discharging "any individual, or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1); *Maynard v. Bd. of Regents,* 342 F.3d 1281, 1288 (11th

21

Cir. 2003).

Because Cowan's discriminatory termination claims are based entirely on circumstantial evidence, in order to prove her *prima facie* case, Cowan must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position from which she was terminated; (3) she was terminated; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. *Id.* at 1289. Cowan is in two protected classes, one of which is only protected by Title VII. Whether she is relying on her race or, alternatively, on her gender, or on adverse decision making because of her different sized class of black females, cannot be ascertained from the record. The fourth requirement is the only disputed element in the instant case.

Cowan can satisfy the fourth requirement by showing either that she was replaced by a person outside her class (the "replacement theory"), or that she was treated less favorably than a comparator individual outside her protected class (the "less favorable treatment theory"). Because Cowan alleges both racial and gender-based discrimination, she gets two bites at the already multifaceted apple. Each claim will be addressed in turn.

The Eleventh Circuit holds that a plaintiff can succeed under the replacement theory even though no single person assumes the plaintiff's job title, or though the plaintiff's former job duties

are spread among multiple employees. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525 (11th Cir. 1987) (reversing this court's grant of the employer's motion for summary judgment where the ADEA plaintiff's former job duties were spread among several employees); *see also, Smith v. Euro-Pro Operating, LLC,* 2007 WL 735674 at *5 (M.D. Ala. March 7, 2007) (Title VII plaintiff established her *prima facie* case via the replacement theory where "while [replacement] certainly did not completely fill [plaintiff's] shoes, [replacement] put his foot far enough in to replace [plaintiff] for a short period of time.") While there are Eleventh Circuit decisions holding that, in order to succeed under the replacement theory, at least one purported replacement must literally fill the plaintiff's former position, these decisions are distinguishable, if not contrary to, other decisions. *See generally, Minton v. American Bankers Ins. Group, Inc.,* 2003 WL 21303330 at *1 (11th Cir. Feb. 6, 2003) (affirming district court's grant of summary judgment where an ADEA plaintiff's position was eliminated and her former job duties were scattered among several employees, and finding that replacement theory was inapplicable, even where some employees assuming plaintiff's job duties were younger than plaintiff); *accord, Puckett v. McPhillips Shinbaum*, 2008 WL 906569 (M.D. Ala. March 31, 2008) (granting summary judgment to employer where Title VII plaintiff's job duties were spread among several employees); *see also, Richardson*

*v. Alabama Pine Pulp Co., Inc.,* 513 F.Supp. 2d 1314, 1321 (S.D. Ala. 2007); *Edwards v. Baptist Health,* 2005 WL 1331262 (M.D. Ala. June 3, 2005).

Approximately eight months after Cowan was fired, her sales territory was split and assigned to three white employees.  Under *Rollins,* Cowan satisfies the fourth requirement of her *prima facie* case for racially discriminatory termination.  However, while this court finds that there is no Eleventh Circuit precedent on point, Cowan's gender-based discriminatory termination claim fails under the replacement theory because one of her replacements was female. *See Richardson,* 513 F.Supp. 2d at 1321-22 (citing *Juniel v. Park-Forest Chicago Heights,* 46 Fed.Appx. 853, 856 (7th Cir. 2002), among other cases, for the proposition that "black employee could not establish prima facie case of discrimination because his responsibilities were spread among a number of individuals, including one black and two white employees").

If Cowan's gender-based termination claim is to survive summary judgment, she must satisfy the fourth requirement via the less favorable treatment theory by proving that a similarly situated male employee received more favorable treatment. *E.g. Maniccia v. Brown,* 171 F.3d 1364, 1368-69 (11th Cir. 1999).

> In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or

24

accused of the same or similar conduct and are disciplined in different ways.  The most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed.  **We require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions** and confusing apples with oranges.

*Id.* (internal citations and parentheticals omitted)(emphasis added). Accepting her version of the facts, Cowan's purported comparator, Brad Fultz, did have a large number of low-call or no-call days, and had administrative difficulties with sample accountability. Fultz was placed on a month-long PIP to discipline him for his sample accountability problem, and he was not terminated. Fultz received no discipline for his low call volume.  Meanwhile, Cowan was placed on a 48 hour PIP and terminated.  Cowan contends that this satisfies the less favorable treatment theory.

However, Cowan's low-call or no-call days and administrative problems were not her only performance issues.  Indeed, there were a litany of performance issues cited on Cowan's H.R. intake sheets, including poor sales numbers.  While Fultz did experience some of the same administrative problems exhibited by Cowan, his sales numbers during the relevant time frame were, unlike Cowan's, undeniably positive.  Cowan has not demonstrated that the quantity and quality of Fultz's misconduct was "nearly identical" to Cowan's.  Because Fultz and Cowan are not similarly situated, Cowan

cannot use Fultz as a comparator to establish a *prima facie* case for her racial termination claim.

Cowan has not demonstrated that other male ISSs were similarly situated.  Cowan points to Herman and Richardson as having lower call volume, and more no-call or low-call days than Cowan.  However, again, Cowan's low call volume was but one of many factors that led to her termination.  Cowan has not demonstrated that her purported male comparators experienced the same litany of performance issues afflicting her.  Absent a similarly situated comparator, this court will not "second guess" Sepracor's employment decision.  *Maniccia,* 171 F.3d at 1369.  Accordingly, Sepracor's motion for summary judgment will be granted as to Cowan's gender-based discriminatory termination claim.

Cowan having satisfied the *prima facie* case for her racially discriminatory termination claim, thereby raising an inference that she was the subject of racial discrimination, the burden shifts to Sepracor to rebut this inference by presenting legitimate, non-discriminatory reasons for terminating Cowan.  *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (citing *Texas Dept. Of Community Affairs v. Burdine,* 450 U.S. 248 (1981)).  Sepracor's intermediate burden is "exceedingly light."  *Id.* (citing *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)).  As explained, *supra,* the myriad issues listed on Cowan's H.R. intake sheets provide a number of legitimate reasons for an employer to

terminate an employee.  Sepracor bears its intermediate burden.

Where the defendant meets the intermediate burden, the plaintiff has the opportunity to demonstrate that the defendant's articulated reasons for the adverse employment action are mere pretext. *Holifield,* 115 F.3d at 1565 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 804 (1973)); *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 796 (11th Cir.1988).  "Put another way, once the employer succeeds in carrying its intermediate burden of production, the ultimate issue in the case becomes whether the plaintiff has proven that the employer intentionally discriminated against him because of his race."  *Holifield,* 115 F.3d at 1565.

Cowan argues that Albright over-scrutinized her performance in an effort to hide his racially discriminatory motives.  Cowan relies upon her earlier job performance evaluations to show that she was performing satisfactorily.  However, the relevant inquiry is whether Cowan was performing well **at the time of her termination**.  *Id.* at n. 7.  This inquiry focuses upon Sepracor's legitimate beliefs, not Cowan's perception of her performance.  *Id.* "Thus, where the employer produces perfomance reviews and other documentary evidence [demonstrating] poor performance, an employee's assertions of [her] own good performance are insufficient to defeat summary judgment, in the absence of other evidence" *Id.* at 1565.  Sepracor has produced many pieces of documentary evidence that Cowan was not performing satisfactorily

27

during the relevant time frame.

Cowan has offered evidence that Sepracor's decision to fire her was incorrect, or a poor business decision. The record is replete with Cowan's plausible explanations and excuses for her shortcomings. However, the question is not whether Cowan agrees with Sepracor's reasons for firing her. Rather, "our inquiry is limited to whether the employer's choice is an honest choice, that is, whether the employer acted in good faith and had reasonable grounds to believe that the disciplined employee engaged in the misconduct." *Bennett v. Chatham County Sheriff Dep't,* 315 Fed. Appx. 152, 160 (11th Cir. 2008)(internal quotations omitted). *See also Standard v. A.B.E.L Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir. 1998) ("the heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons"). Regarding Cowan's explanations and excuses in response to Albright's inquiries:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000). *See*

28

*also Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) ("it is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated"), *overruled on other grounds by Manders v. Lee,* 338 F.3d 1304 (11th Cir. 2003).

Cowan has attempted to rebut Sepracor's articulated reasons for terminating her, but disagreement does not prove pretext. Cowan points to evidence that: (1) Sepracor did not use poor sales performance as grounds for termination in 2008 (Doc. 53 at 48); (2) Cowan was never evaluated on sales performance in her yearly reviews (*id.*); (3) Sepracor did not discipline employees for having fewer than the average number of calls per day (*id.* at 22); and (4) Sepracor did not discipline employees for entering summary or perfunctory call notes into STARS (*id.* at 20-21). Cowan's argument is that no other employee faced discipline for any one of the above deficiencies. However, Cowan cannot argue that one employee exhibiting **all** of the above referenced problems would not be severely disciplined. Absent evidence of any racial discrimination by Sepracor, Cowan does not carry the burden of demonstrating that Sepracor's legitimate reasons for disciplining and firing her were pretextual. Sepracor's motion for summary judgment as to Cowan's racially discriminatory termination claim will be granted. *See, Holifield,* 115 F.3d at 1565-66.

Assuming, *arguendo,* that Cowan has established a *prima facie*

case for gender-based discriminatory termination, that claim would also perish under the *McDonald-Douglas* burden shifting analysis due to the same shortcomings exhibited by Cowan's racial discrimination claim.

**Retaliation Claims**

To establish her *prima facie* case for Title VII retaliation, Cowan must prove that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two. *Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998). Once a plaintiff establishes a *prima facie* case, the burden shifting analysis applies. *Id.*

Title VII's anti-retaliation provision makes it unlawful for an employer to discriminate against an employee because she has opposed practices precluded by Title VII. 29 U.S.C. § 2000e-3(a). The Supreme Court has held that, for purposes of retaliation, "opposition" goes beyond filing a formal complaint or instigating a lawsuit. *Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.,* 129 S.Ct. 846, 850-51, __ U.S. __ (2009). The Eleventh Circuit holds that internal complaints to supervisors about workplace discrimination constitute protected activity for the purposes of retaliation analysis. *E.g., Holifield,* 115 F.3d at 1566 (finding that both plaintiff's EEOC charge and internal complaints to supervisors constituted protected activity).

30

Cowan points to numerous examples which she claims constitute participation in statutorily protected activity, including: (1) filing an EEOC charge in 2007 that alleged sexual harassment by Tyrone Dunn; (2) Cowan's March 25, 2008 email to Munroe complaining of retaliation after the sexual harassment complaint; (3) Cowan's former lawyer's April 9, 2008 letter alleging retaliation and racial discrimination; and (4) Cowan's June 26, 2008 EEOC Charge. Each of these instances satisfies the protected activity requirement of Cowan's *prima facie* retaliation claim.

Likewise, Cowan points to numerous actions by Sepracor which she alleges constitute adverse employment actions, including: (1) Albright's contacting HR in January of 2008 regarding Cowan's problems with her administrative duties; (2) Albright giving Cowan negative ratings during the February 21, 2008 field ride; (3) Albright calling Cowan to meetings on March 21, 2008 and again on May 13, 2008; (4) Cowan's final warning on June 2, 2008; (5) Cowan's placement on a PIP on June 2, 2008; and (6) Cowan's termination on July 30, 2008. As the Supreme Court explained in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), an adverse employment action is employer conduct that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." (Internal quotations omitted.) The Eleventh Circuit has found that "*Burlington* also strongly suggests that **it is for a jury to decide** whether anything more than the most

31

petty and trivial actions against an employee should be considered
. . . adverse employment actions." *Crawford v. Carroll,* 529 F.3d
961, 974 n.13 (11th Cir. 2008)(emphasis added). Obviously, Cowan's
termination was an adverse employment action under *Burlington
Northern.* Likewise, Cowan's June 2, 2008 final warning, as well as
her placement on a PIP could have dissuaded a reasonable worker
from making a charge of discrimination, satisfying *Burlington
Northern's* articulation of an adverse employment action. Cowan
satisfies the second requirement of her *prima facie* Title VII
retaliation claim.

Regarding the third requirement, the Eleventh Circuit requires
its lower courts to "construe the causal link element broadly so
that 'a plaintiff merely has to prove that the protected activity
and the . . . [adverse] action are not completely unrelated.'"
*Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004), quoting
*Olmsted,* 141 F.3d 1457, 1460 (11th Cir. 1998). A plaintiff can
satisfy the causal connection requirement via circumstantial
evidence where there is a close temporal proximity between the
employer's knowledge of protected activity and the adverse
employment action. *Higdon,* 393 F.3d at 1220. When temporal
proximity provides the only evidence of a causal connection, the
Supreme Court requires that the protected activity and adverse
employment action be "very close" in time. *Clark County School
Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing with approval

two cases holding that time-lags of three and four months, respectively, were insufficient to establish a causal connection); *see also Wascura v. City of Miami,* 257 F.3d 1238, 1248 (11th Cir. 2001) (time lag of three and a half months insufficient to establish a causal connection). "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Higdon,* 393 F.3d at 1220. The Eleventh Circuit holds that an adverse employment action occurring within one month of an employee's protected activity is sufficient, in and of itself, to satisfy the causal connection requirement. *Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986).

Cowan was given a final warning on June 2, 2008. Much of Cowan's protected activity, including her March 25, 2008 email complaining of retaliation, her June 26, 2008 EEOC charge, and her former lawyer's April 9, 2008 letter alleging retaliation and race discrimination, fall within a two and a half month window preceding her final warning. This court finds that for Rule 56 purposes, Cowan has satisfied the causal connection element of her retaliation claim. As to Cowan's 2007 EEOC charge against Dunn, there is direct evidence to suggest that her sexual harassment claim motivated Sepracor to terminate her, because details about that claim were included on both H.R. intake sheets. The intake

33

sheets recommended Cowan's termination based on the information they contained, presumably including her protected activities.

As noted, *supra*, Sepracor has presented legitimate non-discriminatory reasons for terminating Cowan. They are sufficient to shift the burden to Cowan to demonstrate that Sepracor's reasons are pretextual. There is both direct and circumstantial evidence to suggest that Sepracor was motivated by retaliatory animus. The inclusion of details about Cowan's various EEOC charges and internal complaints on the intake sheets used by the administrative committee to discipline Cowan, provides direct evidence of retaliation. As well, Albright's numerous references to Cowan's 2007 sexual harassment claim provide circumstantial evidence that he was retaliating. In preparing the intake sheets, Munroe included Albright's verbatim comments. Cowan has met her burden by demonstrating that Sepracor's proferred legitimate reasons for her termination were pretext for retaliatory animus. Because there is a genuine issue of material fact as to whether Sepracor's firing of Cowan was in response to her protected activity, Sepracor's motion for summary judgment will be denied as to Cowan's Title VII and § 1981 retaliation claims.

As to Cowan's FMLA leave retaliation claim, there is no evidence that the second occasion on which Cowan took FMLA leave influenced Sepracor's decision to terminate her. Her only hope to satisfy the causal connection requirement is temporal proximity.

34

Cowan took her second FMLA leave from June 4 to July 3, 2008, and was fired on July 30, 2008, thus satisfying the causal connection requirement.  However, as the Supreme Court held in *Breeden,* "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." 532 U.S. at 272 (holding that district court's grant of summary judgment was appropriate under these facts).  Likewise, the Eleventh Circuit has held that, "in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." *Drago v. Jenne,* 453 F.3d 1301, 1308 (11th Cir. 2006) (affirming district court's grant of summary judgment).  Here, Albright contemplated terminating Cowan as early as April, 2008.  Furthermore, Cowan's June 3, 2008 placement on a final warning PIP was a last step before her termination.  Both of these events occurred before Cowan's second FMLA leave.  The court cannot find that Cowan took her FMLA leave as a self-protective measure, although a jury might.

Even if Sepracor had not planned to terminate Cowan prior to her second FMLA leave, she would nonetheless fail the burden shifting analysis because Cowan has produced no evidence to show

that Sepracor's legitimate reasons for terminating her were pretextual, or that it was really motivated to fire her because she took a second FMLA leave in June, 2008. Her performance was already being criticized long before she took leave on account of stress.

Cowan's first FMLA leave was from August to October of 2007, which is so far distanced from any adverse employment action that it cannot demonstrate a causal connection. *See supra.* The only possible evidence that Cowan's first FMLA leave could have motivated Sepracor to terminate her was its inclusion on the first H.R. intake sheet. Notably, the mention of FMLA leave was included as part of Cowan's May 15, 2008 response to one of the inquiries posed by Albright during their meeting at the Birmingham Airport on May 13, 2008. (Doc. 47-34 at 50-63.) Specifically, during the meeting Albright inquired as to why Cowan's sales numbers were low during the end of 2007. (*Id.*) In her e-mail, Cowan responded that one explanation for her low sales was that she "was on medical leave from August until October [of] 2007." (*Id.*) This response was included in the first H.R. intake sheet, as were some of Cowan's other responses. Although a mere reference to an incident in an H.R. report is thin, Cowan satisfies her *prima facie* case of FMLA retaliation.

The only evidence that Cowan's 2007 FMLA leave was a basis for any of Sepracor's adverse employment actions is in the first intake

36

sheet.  The second intake sheet is devoid of any mention of Cowan's FMLA leave.  (Doc. 47-37 at 66-67.) Likewise, neither Albright nor any other supervisor referred to Cowan's 2007 FMLA leave in any emails or other communications.  Accordingly, Cowan cannot demonstrate that Sepracor's legitimate reasons for terminating her were pretext for retaliating against her for taking FMLA leave in 2007.  Because there is no genuine issue of material fact, and Sepracor's motion for summary judgment will be granted as to Cowan's retaliation claim, insofar as brought under the FMLA.

### CONCLUSION

For the reasons stated, both Cowan's and Sepracor's motions to strike will be denied, and Sepracor's motion for summary judgment will be granted in part and denied in part.  Sepracor's motion for summary judgment will be granted as to Cowan's following claims: (1) racially discriminatory termination; (2) gender-based discriminatory termination; and (3) FMLA retaliation.  Sepracor's motion for summary judgment will be denied as to Cowan's Title VII and retaliation claims.  A separate order effectuating this opinion shall be entered.

DONE this 15th day of February, 2011.


WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

37